IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CASCADIA WILDLANDS, an Oregon non-profit corporation; OREGON WILD, an Oregon non-profit corporation; and BENTON FOREST COALITION, an Oregon corporation, | Civ. No. 6:18-cv-00858-TC |
| Plaintiffs, | ORDER |
| v. | |
| ALICE CARLTON, in her official capacity as Umpqua National Forest Supervisor; and UNITED STATES FOREST SERVICE, an administrative agency of the United States Department of Agriculture, | |
| Defendants. | |

**MCSHANE, Judge**:

      Plaintiffs Cascadia Wildlands, Oregon Wild, and Benton Forest Coalition (collectively, "plaintiffs"), seek a preliminary injunction that would halt implementation of a July 11, 2017, United States Forest Service ("FS") decision to allow logging as part of the Quartz Integrated

1 – OPINION AND ORDER

Project ("Quartz Project"). Specifically, plaintiffs allege that the FS violated the National Environmental Policy Act (NEPA) by failing to allow for public comment regarding amendments to the timber sale, and by failing to adequately account for management changes on adjacent land belonging to the Bureau of Land Management ("BLM"). Because plaintiffs have not established a likelihood of success on the merits and because, at this eleventh hour, the plaintiffs cannot establish that an injunction is in the public interest or that the balance of equities tips in their favor, plaintiffs' Motion for Preliminary Injunction, ECF No. 16, is DENIED.

## FACTUAL BACKGROUND

On July 11, 2017, the FS authorized the Quartz Project in a Finding of No Significant Impact ("FONSI"). The Quartz project was implemented to improve forest stand growth, health, and diversity within forest lands of the Umpqua National Forest, and to reduce risks of wildfire. AR13464. Following authorization, the FS entered into two separate timber sales with defendant intervenors Rosbo and Swanson Group (the "intervenors"). The sales were completed in September of 2017 and both intervenors have completed the ground operations necessary for harvesting the timber. Some logging is already underway.

Plaintiffs challenge the logging of a 517 acre component of the Quartz project that encompasses stands of 90 to 130-year-old trees in matrix designated forest. The FS maintains that these overly dense stands are highly prone to fire and are impacting healthy forest diversity. Under the Northwest Forest Plan ("NWFP"), matrix lands comprise the area "in which most timber harvest and other silvicultural activities will be conducted." AR 4100. Matrix lands were designated to emphasize "the economic and social benefit of timber harvest." AR 4143. Under the Umpqua Forest Plan managed by the FS, the primary management objective in the contested area is timber production and extraction of mineral resources.

2 – OPINION AND ORDER

At the heart of this controversy is the existence of a small rodent known as the red tree vole, a hamster-like mammal that lives in the forest canopies of the Pacific Northwest. The red tree vole is "protected" and the NWFP lists it as a Category C "Survey and Manage" species. As a protected species, known red tree vole nesting sites are protected from logging unless the land manager determines the site is "non-high priority" ("NHP"). If a site is deemed NHP, then it is not needed for species persistence and it is subject to land management action such as logging.

The FS began survey efforts regarding red tree voles in the project area as early as 2013. On August 27, 2014 the FS released an environmental assessment (EA) for public comment. During that comment period, plaintiffs submitted data regarding 51 vole nests in the project area and questioned the efficacy of the earlier study. The FS accepted the data as true and confirmed 87 vole nests. On April 4, 2016, the FS published a final EA and a draft FONSI as to the Quartz project. Plaintiffs participated in an objection resolution meeting where they again questioned the findings with regard to the red tree vole. This led to additional surveys of the vole in the summer and fall of 2016. The EA was amended in July and December of 2016 to identify 9 additional vole nesting sites. The amendments were not released to the public until June 26, 2017. Two weeks later, the FS signed the FONSI.

In August 2016, one year before the final FONSI, and four months after the FS published the final EA and the draft FONSI, the BLM published a new Record of Decision (ROD) and Resource Management Plan for over 1.3 acres of land it manages, some of which is adjacent to the Quartz Project. This 2016 ROD supersedes the 2001 ROD. In designating the vole sites NHP, the FS in the EA analyzed the perseverance of the vole in part through an analysis of vole habitat in lands adjacent to the Quartz Project. In May of 2017, after the BLM published the 2016 ROD, the FS analyzed the potential impacts, if any, of the 2016 ROD on the NHP site designation for

3 – OPINION AND ORDER

the red tree vole. AR 13453-13457. This internal FS analysis was not publicized until the FS produced the administrative record after plaintiffs filed this action.

The plaintiffs maintain that the FS was not transparent in their evaluation of the vole population in the Quartz project and, as a result, failed to adequately inform the public and receive public input in the determination that the timber sales were appropriate. The plaintiffs believe that FS has "gone out of its way to ensure the existence of red tree voles would not hinder its proposed timber harvest." Pls.' mem., 6. Specifically, the plaintiffs allege the FS violated NEPA by not providing its internal analysis of the 2016 ROD or the two amendments to the EA for public comment. As noted, plaintiffs seek an injunction prohibiting the intervenors from logging on any of the roughly 500 acres in dispute.

## STANDARDS

A plaintiff seeking a preliminary injunction must establish: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When there are "serious questions going to the merits," a court may still issue a preliminary injunction when "the balance of hardships tips sharply in the plaintiff's favor," and the other two factors are met. *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). The court's decision on a motion for a preliminary injunction is not a ruling on the merits. *See Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984).

/ / / /

/ / / /

/ / / /

## DISCUSSION

I.  **MERITS OF PLAINTIFFS' NEPA CLAIMS**

Plaintiffs allege the FS violated NEPA by failing to adequately involve the public in the decision-making process. As this case centers on an agency's decision under NEPA, I review the FS's decision under the Administrative Procedure Act. *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011) (per curiam). Under the APA, a court's review of an agency decision should be searching but narrow, and the reviewing court should take care not to substitute its judgment for that of the agency. *Oregon Wild v. United States*, 107 F. Supp. 3d 1102, 1109 (D. Or. 2015) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)). Under this review, the court "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. An agency decision made without adherence to required procedure is not in accordance with law. *Id.*; *Idaho Sporting Cong. Inc. v. Alexander*, 222 F.3d 562, 567 (9th Cir. 2000).

There is no minimum amount of public involvement necessary for an EA to be valid under NEPA. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970 (9th Cir. 2003). But the NEPA regulations are clear that some level of public involvement is necessary so that the agency can make a fully informed decision before taking action that impacts the environment. *Id.* at 970-71. Generally, the agency must involve the public "to the extent practicable." 40 C.F.R. § 1501.4(b). "An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,

5 – OPINION AND ORDER

524 F.3d 938, 953 (9th Cir. 2008). Evaluation of whether there was sufficient public involvement under NEPA for an EA is case specific. *Sierra Nevada Forest Prot. Campaign v. Weingardt*, 376 F. Supp. 2d 984, 991–92 (E.D. Cal. 2005).

Plaintiffs make two arguments that the FS violated NEPA's procedural requirements: first, plaintiffs point to the two amendments to the EA identifying additional vole sites as NHP; second, plaintiffs point to the internal FS document concluding the 2016 ROD did not present substantial changes to the FS determination that the vole sites were NHP. In both instances, plaintiffs argue the FS did not allow adequate public involvement.

### A. The Amendments to the EA.

In August of 2014, the FS released the draft EA for the Quartz project. AR 7404-7676. That EA included the FS's surveys to date of red tree vole sites within the project boundaries. The FS surveyed 1,309 acres of potential habitat and identified 13 potential nests. AR 7557. Upon further inspection, the FS concluded only one of the potential nests was confirmed as a red tree vole nest. AR 7557. Due to the rather small scale of the logging project versus the remaining vole habitat in the watershed, the FS concluded "the cumulative effects of the Quartz Project are minor and would not result meaningfully reduce [sic] the ability of the RTV to persist on the landscape." AR 7557.

The public had ample opportunity to comment on the FS determination that the identified vole sites were NHP. In fact, plaintiffs conducted their own surveys of the area and identified numerous active red tree vole sites. The FS accepted the sites identified by plaintiffs. In April 2016, the FS released the final EA. AR 10292-10578. The final EA outlined the public comments received on the red tree vole, noted the FS confirmed many of those sites, and noted

87 nest sites were confirmed to date. AR 10449. The EA also outlined the FS's determination that the sites were NHP. AR 10449. To designate a site NHP, the FS assessed four criteria:

- Moderate-to-high number of likely extant sites/records.
- High proportion of sites and habitat in reserve land allocations or limited number of sites within reserves, but the proportion or amount of potential habitat within reserves is high and there is a high probability that the habitat is occupied.
- Sites are relatively well distributed within the species range.
- Matrix S&G or other elements of the NWFP provide a reasonable assurance of species persistence.

AR 10449.

The EA outlined its determination to designate the sites NHP, AR 10449-10453, and incorporated by reference its June 2015 and August 2015 proposals for designating the sites NHP, AR 9274-9302. These 27 page documents contain the FS's analysis of the decision to designate the sites NHP. Plaintiffs objected to the FS's NHP designation. AR 10612; 10643-50.

In June 2016, plaintiffs and the FS conferred in an "Objection Resolution" meeting. During that meeting, plaintiffs specifically objected to the NHP designations and outlined their concerns regarding the FS's survey procedures. AR 10793-96. During the fall of 2016, the FS conducted an "Additional Survey Effort," identifying 38 additional nests, seven new sites, and an expansion of 3 previously discovered sites. AR 13386.

Based on the additional findings, the FS developed two amendments to the EA. The first amendment, dated July 19, 2016, identified two additional sites. AR 10861. The second amendment, dated December 6, 2016, identified 63 new nests and seven new known vole sites. The FS released the amendments on June 26, 2016. Two weeks later, on July 11, 2017, the District Ranger signed the FONSI. AR 13478. Plaintiffs argue the failure to release the two amendments earlier, i.e., in time to receive public comment on the amendments, violated NEPA.

7 – OPINION AND ORDER

"An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of the circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process." *Bering Strait*, 524 F.3d at 953. At this stage, the FS appears to have complied with NEPA. The plaintiffs had multiple opportunities to comment on the FS proposal to designate red tree vole sites as NHP. And plaintiffs certainly took advantage of those opportunities. Outside of the formal times for public comments and objections, the plaintiffs met with the FS representatives during a two hour meeting where the parties discussed procedures for surveying and designating red tree voles. In fact, it was through the plaintiffs' objections (along with their own surveys) that the FS confirmed numerous additional sites and nests beyond those identified in the draft EA.

"[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373 (1989) (internal footnote omitted). A supplemental EIS is required when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* at 372 (quoting 40 C.F.R. § 1502.9). The standards for a supplemental EA are the same as those for a supplemental EIS. *Olympic Forest Coal. v. U.S. Forest Serv.*, 556 F. Supp. 2d 1198, 1205-06 (W.D. Wash. 2008). Here, the survey process was ongoing, from 2013 until December 2016, in large part based on public comments. Requiring the FS to open up every additional confirmation of a nest or site in the Quartz area to public comment would likely result in a never-ending process of supplements and further comment. The amendments here, drafted after the release of the final EA, appear to be minor changes to a process—designating vole sites

8 – OPINION AND ORDER

as NHP—plaintiffs were well aware of and involved in. Additionally, in its August 4, 2016 written response to the objections of plaintiff Benton Forest Coalition, the FS noted that based on the objections, it would conduct further surveys and assess whether to manage any future sites as known sites or include them in the NHP designation. AR 12997. And the FS did just that. At this stage, it appears the FS involved the public "to the extent practicable" in its decision to designate the sites NHP.

### B. The Internal Analysis of the 2016 ROD.

Plaintiffs also argue the FS violated NEPA by not releasing to the public a May 2017 internal analysis regarding the BLM's recently adopted 2016 ROD. This five-page document[1] concluded the new ROD did not alter the earlier FS decision to designate the sites NHP. AR 13453-47. As part of the NHP designation process, the FS had to consider several factors influencing the persistence of the red tree vole. One of these factors was the condition of the species on adjacent lands. AR 6425. The final EA, issued in April 2016, analyzed local BLM lands in the watershed under the then-in-place 2001 ROD. Four months later, in August 2016, the BLM published the 2016 ROD.[2] As noted, nine months later, in May 2017, the FS conducted its internal analysis of the impact, if any, of the 2016 ROD on the NHP designation.

As the BLM published the 2016 ROD after the FS released the final EA, plaintiffs essentially challenge the FS's conclusion that the 2016 ROD did not require a supplemental EA. As noted above, a supplemental EA is necessary when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Marsh*, 490 U.S. at 372 (quoting 40 C.F.R. § 1502.9). "Whether new information

---

[1] The analysis itself was 2.5 pages, followed by two pages of maps.
[2] The BLM released a draft 2016 ROD on April 24, 2015. AR 10870.

9 – OPINION AND ORDER

requires supplemental analysis is a 'classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012) (quoting *Marsh*, 490 U.S. at 376).

The FS noted that the 2016 ROD only impacted BLM lands. AR 13453. While the changes meant only 19 BLM sites would be in reserves (as opposed to 27 under the 2001 ROD), this did not change the designation because the lower number of reserved sites "is still reasonably defined as a limited number of sites."[3] AR 13453. Although certain previously reserved lands (i.e., riparian reserves) were now open to logging, the FS noted other late successional reserves and district designated reserves actually "increased as more older, complex forest was placed into reserve." AR 13454. The FS concluded the 2016 ROD would result in a 1% increase in suitable red tree vole habitat within reserves, "though this is not likely to constitute any real change in tree vole persistence." AR 13454. The FS noted that while the BLM lands would be less likely to contribute to species persistence, BLM lands only accounted for 8% of watershed lands and the FS lands— consisting of 81% of the lands in question—remained with the previous protections in place. AR 13455. The FS concluded:

> The revision of the BLM [RODs] did not alter the number or spatial distribution of likely extant sites or records, or the amount or proportion of suitable habitat in reserves, and did not compromise the ability of other standards and guidelines or elements of the NWFP to provide a reasonable assurance of species persistence at the watershed scale. No changes (other than an increase of BLM LSR/suitable habitat in reserves) occurred at the project scale [].

AR 13455.

---

[3] As noted, one factor of the NHP designation was "High proportion of sites and habitat in reserve land allocations or limited number of sites within reserves, but the proportion or amount of potential habitat within reserves is high and there is a high probability that the habitat is occupied." AR 10449.

"[I]f the agency, after the requisite 'hard look' in a reevaluation, determines that the new impacts will not be significant (or not significantly different from those already considered), then the agency is in full compliance with NEPA and is not required to conduct a supplemental EA." *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154-55 (9th Cir. 2008). At this stage, it appears that the FS's determination that the 2016 ROD did not significantly alter its earlier NHP designation was neither arbitrary nor capricious. *See Marsh*, 490 U.S. at 377-78 (noting courts must defer to the agency's expertise and not set aside and agency decision when "the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information."). In making this determination, I note the minimal area, i.e., eight percent, of the total watershed lands potentially impacted by the 2016 ROD. Additionally, I note the BLM's own conclusion, provided in its July 2015 comments to the FS, that:

> most of the suitable habitat (and all habitat) in the watershed occurs in the south half on USFS lands. The north half of the watershed on BLM lands contains proportionally low amounts of habitat in a fragmented checkerboard landscape where intervening private lands are currently being clearcut harvested at significant rate. . . . Similarly, it should be noted that most of the connectivity in the watershed is/would occur in the south half. In the north half of watershed connectivity is, and would continue to be, extremely low and fragmented under all timeframes and spatial scales. . . . The poor quality, amount and orientation of habitat, and lack of current or future connectivity in the north half of the watershed may not affect many of the grand conclusions of the proposal, but should be noted and would affect many of the conclusions at the entire-waterhsed scale (i.e., many proposal conclusions are only accurate for the south half of the watershed).

AR 09211.

The FS appears to have taken a "hard look" at the 2016 ROD and, although plaintiffs disagree, reached a reasonable conclusion that it did not significantly alter its earlier designation. In other words, although the FS was required to consider habitat on adjacent lands, it does not

11 – OPINION AND ORDER

follow that any changes to land use practices on adjacent lands necessarily results in a meaningful impact on the FS NHP designation.[4]

## II.    OTHER FACTORS FOR PRELIMINARY INJUNCTION

A plaintiff seeking a preliminary injunction must establish: (1) likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. Although I conclude plaintiffs have not demonstrated a likelihood of success on the merits of their claims, I recognize that the Court of Appeals could disagree with that conclusion. Therefore, considering the immediacy of both the potential harm and the logging in question, I find it prudent to at least discuss the other factors relevant to plaintiffs' requested preliminary injunction.[5]

Plaintiffs have demonstrated a likelihood of irreparable harm. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (noting logging of 1,652 acres and plaintiffs' members harm of inability to "view, experience, and utilize" the land in undisturbed state constituted irreparable harm). Although plaintiffs demonstrate a likelihood of irreparable harm, that is only one of the four prongs in the preliminary injunction analysis.

I find the balance of hardships and the public interest elements do not tip sharply in the plaintiffs' favor. If anything, because of the timing of the motion, those prongs tilt in defendants' favor. While it is clear that once the logging occurs on the disputed acres, plaintiffs' recreational opportunities on the land are irreparably lost, that fact is true in any environmental case. In

---

[4] As pointed out by the FS, the 2016 ROD appears to grant significant discretion on land managers regarding projects already begun as well as those authorized within two years of the 2016 ROD. FS Mem., 40 (citing AR 13022). If so, the BLM land manager could decide to use the 2001 ROD for the BLM land adjacent to the Quartz Project. In that scenario, the 2016 ROD would have no impact at all on the EA.

[5] I note that even absent a showing of success on the merits, plaintiffs would be entitled to an injunction provided they raised "serious questions going to the merits" and that the balance of hardships tilts sharply in their favor. *Alliance of the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

12 – OPINION AND ORDER

*Cottrell*, the balance of hardships tilted sharply in plaintiffs' favor when they were unable to participate in the administrative appeals process at all and had no opportunity to seek changes in the project before it received final approval by the FS. 632 F.3d at 1137–38. The quantified economic harm to the FS there was up to $16,000 in lost revenues, and perhaps up to an additional $70,000 if the project were to receive no bids. *Id.* at 1138.

Here, plaintiffs had ample opportunity to avail themselves of the administrative appeals process, and indeed did so as a necessary prerequisite to this litigation. Compl. ¶ 9; *see also, e.g.*, AR 10643-10650. Additionally, unlike the largely speculative economic hardships to the Forest Service in *Cottrell*, there are substantial public and private vested interests in the form of signed contracts, jobs, and tax revenue, among other things, that will be negatively and definitely impacted if the preliminary injunction issues. *See* Tattersall Decl. ¶¶ 4-6, ECF No. 26; *see also* Dudley Decl. ¶¶ 2-3, 6, ECF No. 23. By waiting eight months after the sale to file the complaint, plaintiffs turned what could have been speculative harms to the plaintiffs into, essentially, vested interests. Roads have been built. Logging has begun. The defendant intervenors are depending on the lumber to keep their mills open and active now and during the coming months.

Additionally, plaintiffs' delay casts doubt on their argument that because the internal FS analysis of the 2016 ROD was only released a few months ago (when the FS filed the administrative record), they "have not had the opportunity to present countervailing evidence[.]" Reply, 11 (internal citation and quotations omitted). I recognize the parties engaged in settlement discussions that ended not even two months ago, and that plaintiffs moved for a preliminary injunction shortly thereafter. But plaintiffs filed this action back in May, while settlement discussions were in full bloom. Nothing prevented plaintiffs from filing this action last year, shortly after the sale occurred. Had plaintiffs not waited eight months, the administrative record

13 – OPINION AND ORDER

would have been filed months ago, and plaintiffs would have had plenty of time to "present countervailing evidence."[6] This ruling would likely be one for summary judgment, on a full record, as opposed to a somewhat rushed ruling after an expedited hearing, with a limited record on an issue with high stakes for all involved parties (not to mention the environment itself).

Finally, the public interest here does not necessarily tip in plaintiffs' favor. The community, one with elevated unemployment rates, would certainly benefit economically from the Quartz Project. Additionally, the FS's interest in fire management is readily apparent (although plaintiffs again disagree on those alleged benefits). While the risk of fire is certainly speculative as to the specific area in question, the raging (and massive) months-long fires in Oregon and Northern California the past few summers demonstrate the threat is real. While I recognize plaintiffs officially request only a temporary injunction over the winter months, there is no guarantee this case will be resolved before the next fire season.

## CONCLUSION

Because plaintiffs have not established a likelihood of success on the merits of their claims, their motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.

DATED this 11th day of October, 2018.

       /s/ Michael McShane
**Michael J. McShane
United States District Judge**

---

[6] Plaintiffs also would have had time to amend their complaint to narrow and focus the issues based on disclosures made in the administrative record. This would have avoided defendants' (and the court's own) confusion as to the exact nature of plaintiffs' claim as to the FS's 2016 ROD analysis.

14 – OPINION AND ORDER